**UNITED STATES of America,
Plaintiff,**

v.

**W.R. GRACE, Henry A. Eschenbach,
Jack W. Wolter, William J. McCaig,
Robert J. Bettacchi, O. Mario Favori-
to, Robert C. Walsh, Defendants.**

**No. CR 05–07–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

Feb. 10, 2009.

David S. Krakoff, Gary A. Winters, James T. Parkinson, Lauren Reid Randell, Mayer Brown Rowe Maw LLP, Washington, DC, Ronald F. Waterman, Gough Shanahan Johnson & Waterman, Palmer A. Hoovestal, Hoovestal Law Firm, Helena, MT, Elizabeth Van Doren Gray, Sowell Gray Stepp & Lafitte, Columbia, SC, William A. Coates, Roe Cassidy Coates & Price, Greenville, SC, for Defendants.

## ORDER

DONALD W. MOLLOY, District Judge.

### I. Introduction

A *Daubert* hearing was held on January 21 and 22, 2009, to resolve the evidentiary issues that remain outstanding following the Ninth Circuit's rulings on appeal in *United States v. W.R. Grace,* 504 F.3d 745

(9th Cir.2007). At the same hearing, the Court considered oral argument on the government's motion for reconsideration of the Court's December 5, 2005 Order, 402 F.Supp.2d 1178 (D.Mont.2005), limiting government experts' reliance materials.

Having followed the guidance offered in the appellate opinion on these matters, and having conducted the Rule 702 and 703 analyses anew, the Court concludes that evidence of indoor releases and historical product testing are excluded under Rule 403 if offered to prove an ambient air release resulting in simultaneous endangerment in violation of 42 U.S.C. § 7413(c)(5)(A), or if offered to prove the fiber concentration levels of a post–1999 ambient air release. Evidence of indoor releases and historical testing is admissible, subject to a limiting instruction, if offered as evidence of the Defendants' knowledge to prove the defrauding object of the conspiracy charge or to prove the obstruction charges. Experts may rely upon indoor air studies and historical product testing under Rule 703 to opine about the propensity of Libby amphibole fibers to release into the air upon disturbance.

The ATSDR Report and Peipins Study are not admissible for any purpose. The documents are excluded under Rule 403, and the government's experts are prohibited from relying on them in forming or expressing their opinions under Rule 703. Fact witnesses may refer to the pathway of exposure conclusions in a limited capacity as described below.

The government's motion for reconsideration is granted in part and denied in part. To the extent the government seeks to add updated environmental sampling results or studies and reports derived from such sampling, the motion is denied. In all other respects, the motion is granted.

## II. Analysis

### A. *Daubert* issues

#### 1. Legal Standard

The appellate opinion remanded the *Daubert*[1] issues for fresh consideration under Fed.R.Evid. 702 and 703. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Ninth Circuit instructed that the Rule 702 inquiry must be an "holistic" analysis of the expert's testimony as a whole. *Grace,* 504 F.3d at 762.

Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

---

**1.** *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Contrary to Rule 702's requirement that an expert's testimony be considered as a whole, Rule 703 requires the court to assess the probative value and prejudicial effect of specific "facts or data" underlying an expert's opinion, and thus invites a document-by-document approach. *Grace*, 504 F.3d at 762. Because the Rules 702 and 703 analyses are distinct, it is first necessary to consider the admissibility of the relevant experts' testimony under Rule 702 before turning to the question of the experts' reliance on the challenged studies under Rule 703.

### 2. Expert testimony

#### a. Dr. Christopher Weis

Dr. Weis is a toxicologist working for the Environmental Protection Agency (EPA). The Supplemental Expert Witness Disclosure filed for Dr. Weis indicates that he will offer opinion testimony consistent with four memoranda he drafted for the EPA from the years 2000 to 2002. Although not stated explicitly in Dr. Weis' disclosure, the supporting materials and his testimony at the *Daubert* hearing make clear that he intends to offer an opinion as to the risk posed to Libby residents from outdoor exposure to airborne asbestos fibers after November 3, 1999. Dr. Weis' memoranda and opinion can be summarized as concluding that exposure to asbestos fibers at former W.R. Grace facilities and other locations throughout the Libby community constitute an ongoing risk to residents, due to the tendency of human activity to disturb dust or soil and cause heightened concentration of airborne fibers in the human breathing zone.

Dr. Weis described the facts and data supporting his opinion at the *Daubert* hearing. *See* Transcript of January 21, 2009 Hrg. (Doc. No. 894) at pp. 27–30. Among other resources, he relied upon historical testing regarding the propensity of fibers to become airborne upon disturbance, investigation of the Libby site and interviews with residents, EPA's own environmental sampling in Libby, epidemiological studies (including studies relating to exposure to Libby amphibole), and toxicological studies involving animals.

■ Having listened to Dr. Weis' testimony and examined his disclosure, I conclude that his opinion testimony is admissible under Rule 702.[2] His proffered testimony is based on sufficient scientific data and is the product of reliable principles and methods properly applied to the facts of this case. This conclusion is consistent with the Court's Order dated September 18, 2006, 455 F.Supp.2d 1203 (D.Mont.2006), holding that expert opinions regarding imminent danger based on EPA risk assessments are admissible except to the extent that such opinion testimony would rely upon evidence of non-ambient releases, historical product testing, or soil sampling "for the purpose of proving the asbestos fiber concentration levels in the charged § 7413(c)(5)(A) releases." Doc. No. 752 at p. 3.

#### b. Dr. Richard Lemen

Dr. Lemen is an epidemiologist and former acting director of the National Institute for Occupational Safety and Health (NIOSH). Epidemiology is the study of disease patterns in a population to reach conclusions about general causation.[3] Dr.

---

**2.** The rulings on the admissibility of expert opinion testimony do not alter or relax the requirement that experts testifying at trial offer only those opinions that have been properly disclosed. The Court will sustain an objection to expert opinion testimony if the opinion offered at trial is not, upon a fair reading of the document, contained in the relevant expert witness disclosure.

**3.** Dr. Lemen discussed general causation as distinct from specific causation, the determi-

Lemen's Supplemental Expert Witness Disclosure lists several opinions that he intends to offer at trial. Relevant for purposes of this discussion is his proffered opinion that states, "The vermiculite materials left by Grace in the town of Libby posed an imminent danger to the public from exposure to the materials, which could cause asbestos-related diseases such as asbestosis, lung cancer, or mesothelioma, and that endangerment persisted until the contamination was remediated." Doc. No. 287 at p. 5.

There is no pending challenge to Dr. Lemen's testimony under Rule 702, nor would such a challenge succeed. Based on Dr. Lemen's disclosure, supporting materials, and testimony at the *Daubert* hearing, his opinions are supported by scientific facts or data, they are the product of reliable principles and methods, and he has applied those principles and methods to the facts of this case is a reliable manner. Dr. Lemen possesses extensive qualifications in the field of epidemiology and explained the process by which he relied upon his own knowledge and experience combined with a range of epidemiological studies to reach his conclusions regarding the heightened risk of development of asbestos-related disease in the general Libby population. His testimony is admissible under Rule 702.

### 3. Reliance materials

### a. Evidence of indoor releases and historical product testing

The Court resolved the Defendant's original challenges to evidence of indoor releases and historical product testing by finding the evidence was admissible for some purposes but not for others. Re-

garding evidence of indoor, non-ambient releases, the earlier Order held that such evidence is admissible to show the Defendants' knowledge or to prove the conspiracy and obstruction counts but inadmissible if offered to prove an ambient air release in violation of § 7413(c)(5)(A). Doc. No. 740. The Order made determinations as to the admissibility of evidence of or derived from indoor releases; the Order made no reference to the testimony of the government's experts in this case and did not rely on or cite Rule 702 or Rule 703. The Order addressing Grace's historical product testing makes specific reference to expert testimony based on historical testing and holds that such testimony is inadmissible if offered to prove an ambient air release in violation of § 7413(c)(5)(A), but may be offered "for the purpose of assisting the jury in making determinations about the Defendants' knowledge of the dangerousness of asbestos contaminated vermiculite." Doc. No. 741 at p. 7.

Although the earlier Order on indoor air studies makes no reference to expert testimony and dealt with the exclusion of evidence under Rule 403, the court of appeals held that this Court erred in "excluding expert testimony based on documents and studies derived from indoor air releases." *Grace*, 504 F.3d at 761. The court of appeals likewise found error in the Court's ruling prohibiting, for certain purposes, expert testimony based on Grace's historical product testing. *Id.* at 762. The court of appeals remanded these evidentiary questions with instructions to conduct the Rule 702 and 703 analyses anew, or in the case of the indoor air studies, in the first instance. Of particular concern to the appellate panel was what it viewed as the

nation of which Dr. Lemen described as a process whereby "a physician, clinician or pathologist would make a specific diagnosis in an individual and conclude that their disease was caused by agent X or some specific

cause." Doc. No. 894 at p. 173. Dr. Lemen testified that he does not reach conclusions about specific causation as an epidemiologist. *Id.*

exclusion under the Court's original Orders of expert testimony relying on the indoor air studies and historical product testing to opine as to the propensity of asbestos fibers to become airborne upon disturbance and the dangers posed by that propensity. *Id.* at 761 (stating, "Based on [indoor sampling], an expert could testify about friability and whether a release of asbestos would occur if asbestos-contaminated vermiculite were exposed or disturbed."); 762 (stating, "This limited use of [historic testing data] to inform experts' opinions is permissible, because the propensity of Libby asbestos to release fibers fits the release element of the knowing endangerment provision.").

The court of appeals goes on to state that I "did not consider this propensity-to-release inquiry, thus abusing [my] discretion by excluding this evidence under 702." 504 F.3d at 762. My earlier expression may not be clear, because I did consider the "propensity-to-release" inquiry, and the Orders did not exclude "propensity-to-release" opinions under Rule 702. The Order on historical product testing made the explicit determination that such testimony is admissible under Rule 702, as is indicated by the following passage:

> To the extent that historical non-ambient testing and sampling conducted informed the Defendants of the dangerousness of the asbestos contaminated vermiculite, *the determination of which includes the nature of its friability,* it is relevant to the knowledge requirement of the charges based upon knowing endangerment, and is admissible under Federal Rule of Evidence 401. *Expert opinions based upon an examination of these studies could aid the jury in making a determination about the nature of Defendants' knowledge and are conse-*

*quently admissible under Federal Rule of Evidence 702.*

Doc. No. 741 at p. 4 (emphasis added).

The Order on evidence of indoor releases also held that the evidence is admissible to show the dangerous nature of asbestos-contaminated vermiculite, which would include evidence of its propensity to release:

> To the extent that Defendants are making the claim that all evidence of or derived from non-ambient releases is irrelevant to the Clean Air Act counts, they are reaching too far.... It cannot be the case that testing and sampling, of which the Defendants were aware, that demonstrated the dangerousness of the materials in question is irrelevant to the knowing endangerment counts simply because it was conducted in non-ambient environments. That Defendants did not conduct tests to determine the risks posed by the types of releases for which they have been charged does not mean that they did not have some notice that those releases could be dangerous, an issue to which such indoor testing and sampling is directly relevant.

Doc. No. 740 at pp. 8–9.

Properly characterized, then, the Court's Order on indoor air studies held that such studies are inadmissible under Rule 403 if offered to demonstrate a release causing simultaneous endangerment or to prove the fiber concentration of a post–1999 ambient air release in violation of the Clean Air Act. The Order held the studies admissible for any other purpose, and stated that the jury would receive a limiting instruction where necessary. The Order on Grace's historical product testing held that expert testimony relying upon such testing is admissible to the extent experts will opine about the dangerous characteristics of asbestos fibers, including the propensity of fibers to become airborne upon disturbance, but inadmissible

where experts would rely upon the testing to opine about the fiber concentration of a post–1999 ambient air release.

 Having now heard and considered the testimony at the *Daubert* hearing and having conducted a fresh Rule 703 analysis for each category of evidence, I am convinced that my earlier rulings regarding the admissibility of evidence of indoor releases and Grace's historical product testing reached the proper outcome under the Federal Rules of Evidence. The government offered no evidence at the *Daubert* hearing to show that an expert in any field would rely upon the data in question to opine, through extrapolation or other means, about the fiber concentration level that would likely have accompanied a post–1999 ambient air release. The government's experts are therefore prohibited, under Rule 703, from offering opinions about post–1999 ambient-release fiber concentrations based on evidence of indoor releases or Grace's historical product testing. Government experts may, as the Court earlier determined, rely upon such data to opine about the propensity of asbestos fibers to become airborne upon disturbance.

The Court's rulings under Rule 403 were not disturbed on appeal and remain in effect as set forth in the original Orders. Documentary evidence and other exhibits containing the results of indoor air studies or Grace's historical testing are inadmissible to prove a release in violation of

§ 7413(c)(5)(A), including the fiber concentration of any post–1999 ambient release, but may be admissible if the government can show that the evidence is relevant to the Defendants' knowledge in relation to the obstruction charges or the defrauding object of the Count I conspiracy. Where necessary, the Court will issue a limiting instruction specifying the purpose for which the evidence is admitted and forbidding the jury from considering it for any other purpose.

### b. The ATSDR Report and Peipins Study [4]

The ATSDR Study is a non-epidemiological study linking pre–1990 exposure pathways in the Libby area to pleural abnormalities in self-selected study participants.[5] The Defendants filed a motion in limine to exclude evidence or expert testimony relating to the ATSDR Study. The Court considered whether the screening study is reliable and relevant as required by Rule 702, and determined that the study should not be the basis of expert testimony on causation. The ATSDR Study is unreliable because participants were not randomly selected, the study lacked a control group, and most important, the authors of the study disavowed any goal of establishing a causal relationship between exposure to Libby amphibole and the incidence of asbestos-related disease. Doc. No. 743 at pp. 20–21. The Court also found the study inadequate under the relevance or "fit" prong of Rule 702 because it failed to take

---

4. The results of ATSDR's medical screening program in Libby were first released in an initial report dated February 22, 2001, known as the "ATSDR Report." The complete results of the program were published in a peer-reviewed study in the November 2003 volume of the research journal *Environmental Health Perspectives*, which has been referred to in this case as the "Peipins Study." *See* Doc. No. 743 at pp. 5–6. The government's experts used the term "ATSDR Study" to refer to Gov. Exhibit 647, which is the published

Peipins Study. For purposes of the evidentiary rulings set forth in this Order, the term "ATSDR Study" refers to all documents based upon the results of the ATSDR medical screening program, including the ATSDR Report and the Peipins Study.

5. The protocol and results of the ATSDR Study are described in detail in the Court's Order dated August 31, 2006, 455 F.Supp.2d 1181 (D.Mont.2006). Doc. No. 743 at pp. 2–9.

account of the duration and intensity of past exposures, thereby rendering it useless for determining the danger posed by post–1999 releases alleged in the Superseding Indictment, which occurred nine years or more after the exposures reported in the ATSDR Study. *Id.* at pp. 25–26. The Court also excluded the studies as unduly prejudicial under Rule 403 due to the likelihood that the associations identified in the studies might be mistaken for causation by trial jurors. *Id.* at pp. 27–28.

The Ninth Circuit on appeal again faulted the Court for conducting its Rule 702 analysis on a document-by-document basis. The appellate opinion does not address the issues of relevance and reliability comprising the Rule 702 inquiry; it simply declares that this Court "misapplied" Rule 702 because it "deconstructed the experts' testimony in a manner not contemplated by Rule 702." 504 F.3d at 765. Rather than remanding the issue for this Court's "holistic" analysis under Rule 702, the court of appeals proceeded, without further discussion or analysis, to declare that the ATSDR Study "is adequate under Rule 702." *Id.* The appellate court explained, "The study's failure to establish causation goes to the weight it should be accorded, but does not mean that an expert could not rely on it in forming an opinion." *Id.*

■ The court of appeals refrained from conducting the Rule 703 analysis, leaving it to this Court to determine whether the ATSDR Study is of the type reasonably relied upon by experts in the field. It is not. Having heard the testimony of the government's expert witnesses on this question and having conducted a fresh Rule 703 analysis, I find that the ATSDR Study does not contain facts or data upon which experts in the fields of toxicology or epidemiology would rely in forming an opinion as to the danger posed by post–1999 ambient air exposures to Libby am-

phibole. This conclusion is based upon a record. I heard the testimony of Dr. Weis and Dr. Lemen, neither of whom testified that the ATSDR Study formed any part of the scientific basis for the opinions either intends to offer at trial.

Dr. Weis began his testimony by stating that the ATSDR Study was "very useful" to him in reaching his opinion on imminent danger to people in Libby. Doc. No. 894 at pp. 16–17. Dr. Weis then went on to specify the two purposes for which the study was useful:

> Well, one of the reasons, perhaps the main reasons that we requested the study was to help us understand the nature and extent of non-occupational exposures in the city of Libby, Montana.

> And the second major reason that we wanted the study conducted was to help us, to the extent that the study could, define exposure pathways for those non-occupational exposures. In other words, how material was getting from a source to the individuals that it was affecting.

Doc. No. 894 at p. 17. Dr. Weis explained the study allowed investigators to identify potential exposure pathways so they would know where to direct efforts to monitor exposures to establish a quantified dose. *Id.*

When asked later about the specific uses to which he put the ATSDR Study, Dr. Weis restated his earlier response:

> Well, again, the main interest I had in this study—and there are others who will, perhaps, express other interests in the study. But my main interest was in helping identify whether or not and to what degree there were non-occupational exposures going on in Libby that were of importance. That was fairly unusual at the time. It certainly was not expected by us when we went into Libby.

The other way—or the other reason that I used the study was to help us identify pathways of exposure, that I've already described at some length, so that we could quantitatively measure those pathways. In other words, go out into the field with monitoring devices and begin to focus our environmental measurements so that we could quantitatively measure those exposure pathways.

Doc. No. 894 at p. 25.

When asked whether the ATSDR Study could be used to form an opinion on causation, Dr. Weis answered, "Causation requires a number of different types of information. I think this study would be a valuable component, but it wouldn't, by itself, suffice to determine causation. It would be one part of several—several pieces of information that would be used to determine causation." Doc. No. 894 at 27.

Although Dr. Weis stated that the study is a "valuable component" of the scientific data that would be necessary to render an opinion on causation, i.e. endangerment, his own explanation of the uses to which the study was put makes clear that it formed no part of his opinion on endangerment. Rather, the study was used to identify exposure pathways and direct the attention of investigators to those pathways so that they could conduct sampling and obtain the quantified dose information that would, together with consideration of actual epidemiological studies and scientific evidence showing the characteristics of asbestos fibers, allow an expert to reach a conclusion about the dangers of post–1999 releases. According to Dr. Weis, the ATSDR Study did not supply the government's scientists with evidence of endangerment, but merely told them where to look for such evidence:

[T]he study clearly showed that there was the possibility of a hazard as related to past exposures, but it didn't tell us what exposures were occurring today, nor did it tell us the magnitude and nature of those current exposures. So we needed to—we used this information to scope and focus specific measurements conducted after 1999. After November 1999. And quantify those exposures.

Doc. No. 894 at pp. 26–27.

Dr. Weis' testimony shows that he did not rely on the ATSDR Study to reach his opinion on endangerment. Except as explained below, he may not mention the study in expressing his opinions at trial. Fed.R.Evid. 703. It is clear from Dr. Weis' disclosure and testimony that his opinion on endangerment is supported by sufficient scientific data, including epidemiological studies and EPA's environmental sampling in Libby. Testimony about the results of the ATSDR study is not necessary to the discussion of Dr. Weis' opinion on endangerment, except as to informing his inquiry of exposure, nor is it proper under Rule 403 and Rule 703. The ATSDR screening program is part of the factual history of the EPA's investigation in Libby, and may be discussed in that limited capacity. In other words, Dr. Weis may testify as a fact witness that those involved with the EPA response in Libby used the ATSDR screening program to help them decide where to focus EPA's sampling efforts. Dr. Weis is precluded from testifying as to the specific results or details of the study, including any discussion or opinions of an association between exposure pathways and pleural abnormalities.

Dr. Lemen's testimony is clear that the ATSDR Study does not form any part of the basis for his opinion on endangerment. Dr. Lemen testified that the ATSDR Study is not evidence of causation and is only weak evidence of an association be-

tween exposure pathways and pleural abnormalities:

> [I]t's not done as a cohort study. It really measures the prevalence of disease in this unrandomly selected population. The population is not randomly selected, they were self-selected into the study as volunteers. Even though the study covered, I think, about 75, 76 percent of the people they started out to study and participate, you've still got 25 percent that didn't participate. Those 25 percent could have been self-selected out for medical reasons or many other reasons. So the ATSDR study, other than being case findings, doesn't add very much.

Doc. No. 894 at p. 184–185. Dr. Lemen testified that an epidemiologist presented with the type of weak association contained in the ATSDR Study would have to "do a full-fledged cohort study or an epidemiological study" in order to confirm a causal relationship. *Id.* at p. 185.

Dr. Lemen stated that he would review the ATSDR Study "because an epidemiologist wants to look at all studies and determine what has been found." *Id.* He did not testify that he would have relied upon the study in forming his opinion, stating, "Would it be something that is absolutely necessary to come to my final opinions? And the answer is no." *Id.* at p. 186. Later in his testimony Dr. Lemen added, "[I]s it absolutely necessary, if you have epidemiological studies? No.... [W]e already had epidemiology showing that asbestos caused disease and asbestos caused pulmonary disease like the study found. So did we need the ATSDR study to conclude that? The answer is no." *Id.* at pp. 187, 188.

When asked specifically if he needed the ATSDR Study to arrive at his opinion in this case, Dr. Lemen answered, "No, absolutely not. I could arrive at that opinion without the ATSDR study. I don't think it's something significant, other than what I said." *Id.* at 192.

While Dr. Lemen was unequivocal in stating that the ATSDR Study was unnecessary as a scientific basis for his opinion, he added that it would not be "good science" to ignore the study entirely. *Id.* at 193. But the fact that an epidemiologist would want to consult the study does not mean that he would rely upon the study in forming his opinion on causation. Dr. Lemen explained that often case studies such as the ATSDR Study precede epidemiological studies, and that in those instances the associations revealed by case studies prompt full-fledged epidemiological inquiries to confirm causation. *Id.* at 186–188. For that and other reasons, an epidemiologist would consult a case study so as to have the most complete information possible. In this instance, however, the ATSDR Study proved unnecessary because epidemiological evidence providing opinions about causation was already available.

Dr. Lemen's testimony does not establish that an epidemiologist would rely upon the ATSDR Study to reach an opinion about endangerment. Accordingly, under Rule 703 the ATSDR Study may not be relied upon by Dr. Lemen or any other epidemiologist in offering an opinion on endangerment or discussing the scientific support for that opinion.

The government has not identified any expert that would reasonably rely upon the ATSDR Study as all or part of the basis for the opinion he intends to offer in this case. The testimony shows that any good scientist would consider the ATSDR Study as a matter of due diligence to ensure a complete inquiry into the subject, but no scientist would rely upon the study to form an opinion on endangerment. The ATSDR Report and Peipins Study, and expert testimony based on those docu-

ments, are therefore excluded for all purposes under Rule 403 and 703, except for the limited exception for fact witness testimony described above.[6, 7]

In addition to the fact that the ATSDR Study does not meet the standard for expert reliance under Rule 703, the complete exclusion of expert testimony based on the ATSDR Study's conclusions about association avoids putting the Defendants in the untenable position of having to risk opening the door to all aspects of the study when they attempt to expose its admitted defects on cross-examination. Such a situation would result if the study is excluded under Rule 403 but experts are permitted to rely upon it under Rule 703. If experts are allowed to state that they have relied upon the ATSDR Study in forming their opinions but prohibited from explicitly discussing its contents, the jury is left with the impression the ATSDR Study is valid scientific evidence in support of the endangerment opinions offered by those experts. The Defendants can rebut that impression only by probing into the study's many deficiencies, which in turn would allow the government to elicit more complete testimony about the study's associational conclusions.

Counsel for the government urged the Court to place the Defendants in that precise position, stating the following at the *Daubert* hearing:

> And the distinction, really, is handing a jury a scientific piece of paper and saying, Here you go, here's some evidence, look at that in the jury room, [versus]

having an expert testify about it. Those are two very different things.

> And what I understood was that it's improper, based on your ruling about the study itself, Exhibit 647, that that could cause undue prejudice. If a jury were to read that paper without the assistance of anybody, without the assistance of cross-examination by the defense. And so the Ninth Circuit opinion clearly says that experts can rely on that study as well as everything else that they've listed in their disclosures, in testifying to their opinions....

> And they would be allowed to say, among other things, I reviewed this ATSDR study that found pathways where people were exposed and with increasing pathways their incidents of disease increased, whatever the basic premise of the ATSDR study is.

Doc. No. 895 at p. 254–255.

As an initial matter, the ATSDR Study did not conclusively identify "pathways where people were exposed." The study assumes that exposure occurred at the pathways listed in its questionnaire, but investigators were not in a position in 2000 to verify whether each of those pathways in fact placed people at risk of exposure to asbestos prior to 1991. It is for this reason that witnesses may discuss the ATSDR Study to describe its role in the EPA response in Libby, but may not discuss the associational findings of the study.

The problem with the government's suggested approach is that it allows Rule 703 to rob the Defendants of the intended pro-

---

6. This exclusion may be lifted upon further inquiry by the Defendants at trial into the manner in which the government's investigators chose the sites for ambient-air sampling in Libby and the surrounding area.

7. Because the ATSDR Study is not the type of evidence that experts would rely upon to render the opinions offered, the Court does not

reach the balancing test of Rule 703. Were it necessary to conduct the Rule 703 balancing, the Court would conclude, for the reasons set forth in detail in its original Order excluding the ATSDR Study, that the minimal probative value of the study does not substantially outweigh its prejudicial effect. *See* Doc. No. 743 at pp. 13–28.

tection of the Court's ruling under Rule 403. As Professor Graham explains,

> Facts, data, or opinions reasonably relied upon by the expert witness in forming his opinion on the subject matter which have not been admitted into evidence are also subject to exclusion on the basis of attendant trial concerns. Thus facts, data, or opinions which would be inadmissible under, for example, Rules 404, 405, 608, 609, and facts, data, or opinions otherwise admissible in evidence which would be excluded under Rule 403, cannot form part of the bases of an expert's opinion under Rule 703. The adverse party may not be placed on the horns of the dilemma of being unable to require disclosure of facts, data, or opinions underlying the expert's opinion or inference on cross-examination without presenting facts, data, or opinions to the jury banned from jury consideration by virtue of other rules of evidence.

3 Michael H. Graham, *Handbook of Federal Evidence* § 703:1 (6th ed. 2006).

This legitimate trial concern supplies an additional basis for excluding testimony based on the ATSDR Study under Rule 703 as well as excluding the study itself under Rule 403.

## B. The government's motion for reconsideration

The United States filed a motion for reconsideration of the Court's December 5, 2005 Order limiting the government experts' reliance materials to those that were disclosed as of January 13, 2006. The government seeks to add new medical and epidemiological studies and scientific and factual information, updated diagnostic and treatment information for government witnesses, and sampling analysis and risk evaluation derived from continued sampling a the Libby site.

The Defendants argue that the motion for reconsideration should be denied because (1) the government seeks to add new analysis and new opinions, not merely supplemental reliance materials in support of opinions already disclosed, and (2) the government prejudiced the Defendants by delaying the disclosure of the new reliance materials until the Court set a deadline for disclosure of October 31, 2008.

The Court's January 14, 2009 Order set forth the standard for consideration of a motion to reconsider the limitations imposed in the December 5, 2005 Order:

> Resolution of the motion for reconsideration is governed by the same authorities leading to the December 5, 2006[sic] Order limiting witnesses, i.e., Rule 16 and the Scheduling Orders in this case. In this complex case, the Court imposed limits on the government's witness list to ensure compliance with the deadlines in the Scheduling Order and to protect the Defendants from the uncertainty and prejudice that would arise if the government were permitted to continuously alter the evidentiary landscape with new witnesses and documents uncovered during its ongoing investigation. The limits set were not arbitrary but were based on the government's representations about the state of the case, and the government's proclaimed readiness for trial in September of 2005.
>
> These considerations are important, but they do not require inflexibility. Where the government makes a reasonable request that does not violate either the letter or the spirit of Rule 16 and does not prejudice the defense, there is room for accommodation.

Doc. No. 881 at p. 22.

■ The government makes a reasonable request with regard to published papers upon which Drs. Lockey, Whitehouse and Miller intend to rely, including the

papers published by those witnesses. That those studies were not included in the government's original disclosure of expert reliance materials is not attributable to the government's failure to prepare its case in a timely manner. Instead, the existence of those new reliance materials is due to the natural progression of scientific inquiry in this area. As Dr. Lemen put it, "[T]here is new data because science continues and doesn't stop at a certain point where the Court may want it to stop." Doc. No. 894 at p. 192.

The Defendants' arguments about the timing of the disclosure of the new studies are not compelling. These are published studies that could have been known to the Defendants at or near the time of publication through the exercise of reasonable diligence on the part of the defense. The government and the Defendants should have had the same amount of time to consider the new studies and prepare to address them at trial. To the extent the Defendants had less time, the alleged prejudice is not attributable to the government. The Defendants' concerns that the new reliance materials constitute new opinions not previously disclosed are better expressed as objections at trial. This Court's approval of additional reliance materials does not alter the rule that experts testifying at trial must remain within the confines of the opinions that are contained in the expert disclosures filed on January 13, 2006, upon a fair, not literal, reading of those disclosures.

The additional materials listed to be relied upon by government witness Paul Peronard present a different question, particularly as it relates to the new sampling contained in the Libby 2 database. The Libby 2 database contains information on all of the sampling performed by the government in Libby and is updated on a continuing basis. The government does not dispute the Defendants' contention that the Libby 2 database contains thousands samples taken after it was last disclosed to the Defendants in 2006, including the majority of the government's ambient air and activity based sampling in Libby.

Counsel for the government concedes that it did not provide the Defendants continuing updates on its sampling, choosing to make no disclosures between 2006 and July 1, 2008. The government argues that the delay should not be held against because it would have provided the sampling evidence if asked. As government Counsel stated at the *Daubert* hearing,

> [W]ith respect to the Libby 2 database, the volume of samples that has been created by EPA up at Libby since the last time we handed the defendants a searchable database of that, in 2006, has not been exclusively available to the government. The defendants have been—it has been available to the defendants upon request.

Doc. No. 895 at p. 301. The government also points out that the sampling evidence has been periodically summarized in publically available reports published by the EPA, and argues that such reports constitute sufficient disclosure of the sampling data.

■ There is a key distinction between the published studies relied upon by Drs. Lockey, Whitehouse and Miller on one hand, and the EPA's continued sampling efforts in Libby on the other. It is the difference between the inevitable progression of science and the deliberate progression of the government's investigation against the Defendants. While the new studies and data are bound to materialize over time as science moves forward, the new sampling constitutes additional factual evidence against the Defendants that exists only because of the government's decision to bolster its case during the pendency of the interlocutory appeals.

None of the authors of the published studies proffered as additional reliance materials are actively investigating to inculpate the Defendants. The same cannot be said of the EPA, which is a major continuing contributor to the investigation and prosecution of the crimes alleged in the Superseding Indictment. The government's generalized descriptions of the nature of the new sampling data support the inference that the new sampling was done with the purpose of shoring up potential weaknesses in government's proof of its knowing endangerment theory.

In taking its interlocutory appeals in this case, the government filed certifications in which the United States Attorney declared that the appeals were not taken for purposes of delay. Doc. No. 731 at p. 2; Doc. No. 765 at p. 2. For the government to take advantage of the delay to augment its evidence against the Defendants while at the same time refusing to produce timely and complete updates of its ever-expanding database to is to engage in exactly the type of conduct that the December 5, 2005 Order was intended to prevent. The volume and nature of the sampling is enormous.

The government should have had the factual evidence it needed to prove its case at the time of the original trial date of September 11, 2006. The new sampling evidence takes unfair advantage of the delay caused by appeal (when the information was not periodically updated as it was developed) and prejudices the Defendants because of the timing and manner of production. The government takes care to observe that none of the sampling evidence alters either its case theory or its experts' opinions. In fact, the purpose of the evidence is to "bolster" the case, it being unnecessary to prove the theory of the case. Doc. No. 895 at pp. 300–301. For those reasons, the government will not be permitted to add to its experts' reliance materials any Libby sampling data disclosed for the first time after August 23, 2006, the date of the government's second Notice of Appeal. This prohibition extends to any report, summary or analysis published by EPA that is based on sampling results in the Libby 2 database that were not disclosed as of August 23, 2006.

With respect to the excluded Libby 2 sampling data, the Defendants reach too far. In their request to continue to search the new sampling and to rely upon any exculpatory evidence contained therein without any potentially adverse consequences, they in effect want to "have their cake and eat it too." The Defendants are free to introduce any such Libby 2 evidence at trial, but in doing so they risk opening the door to the introduction of the excluded sampling by the government to rebut the inferences sought to be drawn by the Defendants' evidence. The proof is out, unless the Defendants choose to bring it in.

### III. Order

Based on the foregoing, IT IS HEREBY ORDERED:

1. The proffered opinion testimony of Dr. Christopher Weis is admissible under Rule 702.

2. The proffered opinion testimony of Dr. Richard Lemen is admissible under Rule 702.

3. Evidence of indoor releases and Grace's historical product testing is excluded under Rule 403 unless offered as evidence of the Defendants' knowledge to prove the defrauding object of the conspiracy charge or to prove the obstruction charges. Such evidence is inadmissible under Rule 403 if offered to prove an ambient air release resulting in simultaneous endangerment in violation of 42 U.S.C. § 7413(c)(5)(A), or if offered to prove the fiber concentration levels of a post–1999 ambient air release. Where

necessary, the Court will issue a limiting instruction specifying the purpose for which the evidence is admitted and forbidding the jury from considering it for any other purpose.

4. Experts may rely upon evidence of indoor releases and historical product testing under Rule 703 to opine about the propensity of Libby amphibole fibers to release into the air upon disturbance.

5. The ATSDR Report and Peipins Study are excluded under Rule 403. Experts may not use the ATSDR Report or the Peipins Study as part of their reliance materials forming the basis for their opinions under Rule 703. The Court will permit limited fact testimony that those involved with the EPA response in Libby used the ATSDR screening program to help them decide where to focus EPA's sampling efforts, but no witness may testify as to the specific results of the program, including any discussion of an association between exposure pathways and pleural abnormalities.

6. The government's motion for reconsideration (Doc. No. 837) is GRANTED with regard to all proposed new reliance materials for government expert witnesses Dr. James Lockey, Dr. Alan Whitehouse, and Dr. Aubrey Miller. The motion is DENIED with regard to all sampling contained in the Libby 2 database that was not disclosed to the Defendants as of August 23, 2006, as well as any reports, analyses or summaries based on the excluded samples.